UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DENNIS WALSH, | § | |
| and DEZRA GUTHRIE and FRANK | § | **CIVIL ACTION NO. 1:13-CV-13** |
| ORTEGA and LESLIE SWEENEY- | § | |
| FAGAN, and JOHN SWEENEY and | § | |
| KATHERINE ORTIZ, | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | **CLASS ACTION COMPLAINT** |
| VS. | § | |
| | § | |
| MICROSOFT, INC. | § | (JURY DEMAND) |
| **Defendant** | § | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

TO THE HONORABLE U.S. DISTRICT JUDGE:

**COME NOW**, DENNIS WALSH, DEZRA GUTHRIE, FRANK ORTEGA,

LESLIE SWEENEY-FAGAN, JOHN SWEENEY, and KATHERINE ORTIZ and others

("Plaintiffs"), by and through their attorneys, and bring this action on behalf of

themselves and all others similarly situated against Microsoft, Incorporated ("Microsoft"

or "Defendant"). Plaintiffs hereby allege, on information and belief, except as to those

allegations which pertain to the named Plaintiffs, which allegations are based on personal

knowledge, as follows:

**I.**

**NATURE OF THE ACTION**

1.      Plaintiffs bring this class action on behalf of purchasers of Microsoft's subscription gaming service known as "X-Box LIVE" in Texas and throughout the United States.  X-Box LIVE is an online multiplayer gaming and digital media delivery service created and operated by Microsoft Corporation.  It is currently the only online gaming service on consoles that charges users a fee to play multiplayer gaming.  It was first made available to the Xbox system in November 2002.

2.      X-Box LIVE was represented as "the entertainment center of the living room – (that) is transforming the world of home entertainment. No longer just a place to reach the coveted 18- to 34-year-old male audience, Xbox LIVE offers something for everyone: access to the best and broadest range of games; one of the world's largest on-demand libraries of HD movies and TV shows, music, and sports; the ability to stay connected with friends and family on Facebook; and the immersive controller-free experience of Kinect. Xbox LIVE continues to attract a growing audience engaged in all types of entertainment content, from sports lovers, fitness fanatics, and movie buffs to females, families with kids, and more core gamers."  *See* http://www.advertising. microsoft.com /international/xbox-live

3.      In 2012, revenues for X-Box LIVE were over $1.2 Billion dollars.  User or subscribers pay for the service by entering their credit card billing information into the system.  The information includes credit card number, expiration date, and address of the account holder.  X-Box LIVE then accesses the information and charges the customer. Microsoft markets to these consumers with millions of dollars spent each year on advertising to the targeted groups.

4.      To sell the product to subscribers, X-Box LIVE asks for the input of a valid credit card to authenticate address and name information.  Once the credit card information is saved, Microsoft accesses this database and rebills customers on a monthly or yearly basis.

5.      What Microsoft fails to disclose is that once the credit card info is input into the system, the credit card info is accessed again by Microsoft and used to pay for purchases not made by the customer.  These purchases are made without cardholders' consent and at many times, the purchases are made after the subscriber has cancelled their X-Box LIVE account.

6.      These purchases are made when Microsoft accesses the secure database containing the cardholders' information.  X-Box LIVE does not ask cardholders to approve the purchases.

7.      To fix the problem would be extremely easy and Microsoft could mitigate the defect by requiring the cardholder to input the CCV code from the back of the credit card each time a purchase is made.  Yet, Microsoft through its X-Box LIVE service chooses not to do this.

8.       Unauthorized credit card billing is illegal in the United States, insofar that individuals credit cards are being charged without cardholders' consent.  As this petition notes, this often occurs after the subscriber has cancelled their X-Box LIVE account.  With the relatively low-dollar amount charges (usually $10.00 per month), a subscriber may not realize they are being charged by X-Box LIVE and Microsoft.  On an individual basis, the charges are small, but in aggregate, Microsoft is generating tens (if not

3

hundreds) of millions of dollars in illicit profits through unauthorized charges.

As users are not using the X-Box LIVE gaming system (as they cancelled their accounts), yet X-Box LIVE is billing them nonetheless, Microsoft suffers no loss of computer networking ability, server maintenance, equipment upgrades, technical support, electricity, and computer processing ability.  Thereby, the illicit revenues generated by Microsoft due to these improper charges is pure profit.

9.    Microsoft is and was aware of this substantial defect in its online gaming system, but failed to disclose it or warn Plaintiffs and the Class of the defect.  Prior to the introduction of its Arbitration Clause in October 2011, Microsoft continued to market X-Box LIVE such that subscribers credit cards are covertly charged.  Despite numerous complaints, Microsoft refuses to fix the system, or offer refunds to cardholders.

In one instance, an X-Box LIVE gaming system was stolen, thieves ran up a bill on the subscriber's credit card, and the subscriber was still liable for the charges.

10.    If Microsoft Customer Service is called and a refund is requested, Microsoft will say, "We fixed the problem," yet the charges will resurface within a month.  At times, cardholders' calls are forwarded to overseas call centers where the operators' language is unintelligible.  These responses show that Microsoft had knowledge of the defect with billing, yet willfully and intentionally decided to hide the defect, resulting in continuing damage to the Class.

11.    Equally insidious is the fact that Microsoft is accessing cardholders' credit card information and data from a secure server, in violation of USC §1030.  That is, subscribers told X-Box LIVE not to charge their credit cards, yet X-Box Live re-accesses the secure database and charges credit cards again.

12.     In October 2012, aware that numerous complaints had been received and that X-Box LIVE was in violation of State and Federal laws, Microsoft instituted an Arbitration Clause to dissuade and prevent claimants from filing petitions in Federal court.  This action shows that Microsoft had knowledge of the defect, yet willfully and intentionally decided to hide the defect and prevent recourse, thus resulting in continuing damage to the Class.  Due to the timing of the Plaintiffs' and Class Members injuries and damages, the Arbitration Clause does not prevent the instant suit.

13.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated, asserting claims as Fraud under Texas Common Law, violations of the Texas Deceptive Trade Practices Act, California Unfair Competition Law, California Law Regulating Automatic Renewal Charges, California Consumers Legal Remedy Act, violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §2310(d)(1), Breach of the Implied Warranty of Fitness for a Particular Purpose, Breach of the Implied Warranty of Merchantability, Negligence, Breach of Contract, Unjust Enrichment, and 18 U.S.C. § 1030 (a)(2)(A), (a)(2)(C), (a)(4), and (g).  Plaintiffs seek damages and equitable relief on behalf of the class, which relief includes but is not limited to the following: providing class members with a refund on credit card purchases charged by X-Box LIVE but not authorized by class members, if no such refund amount can be determined, to refund Plaintiffs and class members all purchases made on their credit cards; a refund of the subscription cost for X-Box LIVE; costs and expenses, including attorney's fees; and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiffs and the Class.

## II.

## JURISDICITON AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §2310(d)(1)(B) and 28 U.S.C. §§1331, 1332, and 1367, because Plaintiffs' claims arise under federal statute.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

15.     With respect to the Magnusson-Moss Warranty Act claims, the amount in controversy in each individual claim is at least twenty five dollars ($25), the proposed class consists of over 100 members, and the aggregate damages exceed $50,000.

16.     This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) ("CAFA"), as to the named Plaintiffs and every member of the Class, because the proposed Class contains more than 100 members, the aggregate amount in controversy exceeds $5 million, and members of the Class reside across the United States and are therefore diverse from Defendant.

17.     This Court has personal jurisdiction over Microsoft because it is authorized to conduct business in Texas, it collects sales tax revenue in Texas, and it has intentionally availed itself of the laws and markets of Texas through the promotion, marketing, distribution, and sale of its X-Box LIVE service in Texas.

18.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the state of Teaxas.  Venue is also proper under 18 U.S.C. §1965(a), because Defendant transacts a substantial amount of its business in this District.

## III.

## PARTIES

19.     Plaintiff Dennis Walsh ("Mr. Walsh") resides in Cibolo, Texas.  Plaintiff originally signed up for a monthly subscription costing $10.00 in March 2011.  Upon reviewing his bank statement, Plaintiff Walsh learned that X-Box LIVE billed him for a yearly subscription costing $64.00.

20.     Once Plaintiff discovered these charges, and verified that he did not make nor authorize the charges, Plaintiff contacted X-Box LIVE customer service in June 2011 and requested a refund.  Plaintiff repeatedly told the X-Box LIVE representative that Plaintiff did not give permission to make these credit card purchases.  *See* **Exhibit 1.**

21.     Plaintiff requested a refund to his credit card for the complete amount. After repeated requests, Plaintiff was denied a refund.  In June 2011, Plaintiff cancelled his X-Box LIVE Account due to the fraudulent billing.  After the cancellation, Plaintiff's credit card was charged $10.00 in July 2011.  At all times, Plaintiff was in his residence in Texas when Plaintiff requested a refund.

22.     A similar situation occurred to the following named Plaintiffs:

(a)     Dezra Guthrie is a natural person and resident of the state of Oregon;

(b)     Frank Ortega is a natural person and resident of the state of California;

(c)     Leslie Sweeney-Fagan is a natural person and resident of the state
of Virginia;

(d)     John Sweeney is a natural person and resident of the state of
Florida; and

(e)     Katherine Ortiz is a natural person and resident of the state of New
York.

23.     Defendant Microsoft Inc. ("Microsoft") is incorporated in Washington
state.  X-Box LIVE is a wholly-owned subsidiary of Microsoft.  Microsoft's executive
offices and company headquarters are located in Redmond, King County, Washington
state.  Microsoft is registered to do business in the State of Texas, and conducts
substantial business here.  Microsoft is a publicly traded company, with net sales of over
$73 billion in 2012, and $1.2 Billion dollars in revenue directly attributed to the X-Box
LIVE gaming service in 2012.  Microsoft markets its X-Box LIVE gaming service
("Subject Gaming Service") throughout the United States, including to at least tens of
thousands of consumers in Texas, which constitutes a significant percentage of
Microsoft's sales in the United States and in Texas.

## IV.

## DEFENDANT'S UNLAWFUL CONDUCT

24.     Since the early 1970s, Microsoft has engaged in the business of designing,
manufacturing, marketing, distributing and selling software, gaming hardware, and
related products and services through its own retail (and more recently, online) stores,
direct sales, third party wholesalers and resellers.

25.     In 2000, as Microsoft developed the original Xbox console, online gaming was designated as one of the key pillars for the greater Xbox strategy.

The company determined that intense online gaming required the throughput of a broadband connection and the storage space of a hard disk drive, and thus these features would be vital to the new platform. This would allow not only for significant downloadable content, such as new levels, maps, weapons, challenges and characters, to be downloaded quickly and stored, but also would make it possible to standardize bandwidth intensive features such as voice communication.

Steve Ballmer and Bill Gates both had a vision of making premium download content and add-ons that would attract many new customers.  The **premium download content would also provide additional revenue** for Microsoft.  *See* http://en.wikipedia.org/ wiki/Xbox_Live

26.     Microsoft markets the reliability, entertainment value, suitability, and ease of use of the X-Box LIVE service.  Regarding the gaming service, Microsoft makes the following representations: "the entertainment center of the living room – (that) is transforming the world of home entertainment."  *See* http://www.advertising.microsoft. com/international/xbox-live

27.     Regarding the gaming service, Microsoft makes the following representations: "No longer just a place to reach the coveted 18- to 34-year-old male audience." *See* http://www.advertising.microsoft.com /international/xbox-live

28.     Microsoft also states that X-Box LIVE, "Offers something for everyone: access to the best and broadest range of games; one of the world's largest on-demand

libraries of HD movies and TV shows, music, and sports; the ability to stay connected with friends and family on Facebook; and the immersive controller-free experience of Kinect." *See* http://www.advertising.microsoft.com /international/xbox-live

29.     Microsoft markets the X-Box LIVE gaming service as suitable for and continuing to attract, "a growing audience engaged in all types of entertainment content, from sports lovers, fitness fanatics, and movie buffs to females, families with kids, and more core gamers." *See* http://www.advertising.microsoft.com /international/xbox-live

30.     However, contrary to its advertisements, Microsoft's X-Box LIVE gaming service is not suitable for everyone, but rather, designed to pump, push, and sell premium content by way of charging subscribers' credit cards.

31.     Microsoft deceives consumers to input their credit card information, yet fails to tell consumers that X-Box LIVE will continue to charge the credit cards, even after the subscription is canceled.

32.  As Microsoft is aware that defects exist, the X-Box LIVE online gaming platform is a covert system to generate revenue and fees from unsuspecting cardholders. Indeed, to correct the defect by instituting various safeguards such as requesting PINs or the requiring the input of CCV codes from the backs of the credit cards would be extremely easy for the Microsoft programmers.

33.     With the purposely designed, organic, and intrinsic limitations of the subject gaming system, it is imperative to have additional methods to verify cardholders' authorizations before allowing these purchases.  Any online gaming service designed to accept credit cards must provide safety and compliance, as well as safeguards to ensure

that unauthorized credit card purchases are not made.  The normal use of the X-Box LIVE gaming system causes this failure, and the violation of Federal and state laws as the system is designed to access the secure credit card database and charge consumers without their consent.

34.     As the hardware and software designer and manufacturer, Microsoft possesses specialized knowledge regarding the composition of its X-Box gaming system, the X-Box LIVE online gaming system, and purchasing demographics.  In fact, as evidenced by the many complaints received by Microsoft regarding unauthorized purchases, Microsoft has been aware of these defects for years, but has done nothing about them.

35.     It is not just reliability at issue here, but the cost to consumers to use the gaming system for the purposes for which it was intended.  Moreover, it appears there is a concerted effort at Microsoft to keep the defect covert and not inform current or prospective customers about the problems with X-Box LIVE.  Nowhere on a Troubleshooting page, does Microsoft note that numerous reports have been received of the unauthorized credit card charges.

36.     To date, Microsoft has taken no action to remedy the defects in its online gaming system, or to offer any refunds.  Rather, to perpetuate the fraud and hide the defect, Microsoft has decided to implement a somewhat vague Arbitration clause to dissuade consumers from presenting a Class Action claim.  Indeed, the clause states that Microsoft prefers 100,000 small claim lawsuits instead of one consolidated lawsuit, which goes against the CAFA of 2005 and established Supreme Court caselaw.

37.     Microsoft knew about the complaints regarding credit card purchases on its X-Box LIVE gaming system.  Microsoft misleads its customers into thinking that it resolved these design problems in its representation that the X-Box LIVE gaming service is "No longer just a place to reach the coveted 18-34 year old male audience" and "offers something for everyone" and "families with kids".  *See* http://www.advertising.microsoft. com/international/xbox-live

38.     To ensure that the X-Box LIVE gaming service would be fit for the ordinary or particular purposes for which the service was intended, Microsoft should have adequately tested the game interface and made sure it did not fraudulently bill credit card holders before releasing the gaming service for commercial sale.  Had Microsoft exercised reasonable care in testing X-Box LIVE, it would have discovered that the software is improperly designed and allows credit card purchases without cardholders' consent and in violation of state and Federal law.

39.     Instead, Microsoft sold defective software and gaming systems to Plaintiff and proposed class members that were not fit for their intended use.

40.     Microsoft also could and should have tested alternate designs of its game interface to prevent these unauthorized credit card purchases.  Indeed, Microsoft should have implemented a parental PIN (Personal Identification Number) verification and/or a CCV code for verification.  As noted, Microsoft has been aware of the weakness and defects in its gaming system for years, yet the lure of tens of millions of dollars in illicit profits is too tempting for corporate officers to end.

41.     Furthermore, Microsoft continues to manufacture and sell its defective X-Box LIVE gaming system through the internet and X-Box 360 gaming console hardware that are still available for sale, even after Defendant was informed by its own customers of the specific design defects alleged herein.

42.     Microsoft profits enormously its X-Box LIVE service with annual revenue exceeding $1 Billion dollars, while Plaintiffs and proposed class members incur damages, including unauthorized charges to their credit cards and the Defendant's refusal to provide refunds for those charges.

43.     Microsoft has a history of introducing defective and ineffectual products into the stream of commerce, and not informing consumers of significant defects in design.  Examples include the Zune, the Microsoft Wireless Mobile Mouse, the Surface Tablet's touch cover, Microsoft BOB, and Windows CE.  Some of these defects have only been remedied through Class Action litigation.

## V.

## PLAINTIFFS' ALLEGATIONS

44.     Plaintiffs were subscribers to Microsoft's X-Box LIVE gaming service.

45.     Plaintiffs subscribed to the subject gaming service and used X-Box LIVE, believing it to be suited for the purpose for which it was intended: serving as a suitable gaming and entertainment experience.

46.     Since subscribing to the gaming service and purchasing access, Plaintiffs'
money was stolen, because when used as designed and intended, the gaming system
allows unauthorized credit card purchases.

47.     Plaintiffs learned that far from being the only one experiencing such
problems with the gaming service, there were thousands of other similar customer
complaints.  Moreover, Plaintiffs have learned that the gaming system accesses the credit
card information on a secure database.  That is, the gaming system accesses the credit
card numbers and personal information after the customers have cancelled their accounts
and without the cardholders consent.  The Plaintiffs did not consent to this unauthorized
access or hacking of data.

48.     In fact, Plaintiffs' experiences with the X-Box LIVE gaming system are
typical of at least tens of thousands of other X-Box LIVE subscribers who have registered
their complaints with Microsoft, and have documented their problems with the gaming
service on various website forums dedicated to Microsoft products.  The similarity of the
user complaints about the gaming service further evidences the uniformity of the product
defects alleged herein.

49.     Plaintiffs have suffered injury in fact and loss of money or property, and
they have been damaged in the amount they lost due to unauthorized purchases on the
defective gaming system, and for the subscription charges consumers paid for the
defective gaming system.  Moreover, if no adequate and functional replacement or fix
exists, Plaintiffs have suffered damages in the amount of the full prices they paid for their
X-Box LIVE accounts.

## VI.

## CLASS ALLEGATIONS

50.     Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

51.     The proposed class consists of all consumers who subscribed to the X-Box LIVE gaming service from the time of its introduction in the marketplace through and including the date of the class notice (the "Class").

52.     This action is properly brought as a class action for the following reasons:

(a)     proposed class is so numerous and geographically dispersed throughout the United States that the joinder of all class members is impracticable.  When Plaintiffs do not know the exact number and identity of all class members, Plaintiff believes there are tens if not hundreds of thousands of class members;

(b)     the disposition of Plaintiffs' and proposed class members' claims in a class action will provide substantial benefits to both parties and the Court;

(c)     the proposed class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed class member were infringed or violated in the same fashion;

(d)     there are questions of law and fact common to the proposed class which predominate over any questions that may affect particular class members.  Such common questions include:

(i)      Whether Defendant exercised reasonable care in testing its X-Box LIVE gaming service prior to its release for commercial sale;

(ii)      Whether Defendant's gaming service is defective when used as directed, intended or in a reasonably foreseeable manner;

(iii)      Whether feasible alternative formulations of the X-Box LIVE gaming service were available;

(iv)      Whether Defendant's gaming service was fit for its intended purpose;

(v)      Whether Defendant's gaming system accesses secure credit card information (including card number, cardholder's name and address, card expiration date) without the cardholder's consent;

(vi)      Whether Defendant's defective gaming system was purposely designed to allow consumers to make duplicate purchases;

(vii)      Whether Defendant's defective gaming system was designed to charge credit cards without the cardholders' consent;

(viii)   Whether Microsoft breached the implied warranty of fitness for a particular purpose;

(ix)      Whether Microsoft has breached the implied warranty of merchantability;

(x)      Whether Microsoft has violated the Magnuson-Moss Warranty Act;

16

(xi)    Whether Microsoft is strictly liable to Plaintiffs and the class and whether Microsoft failed to warn Plaintiffs and the class;

(xii)    Whether Microsoft committed Fraud under Texas Common Law;

(xiii)    Whether Microsoft has violated the Texas Deceptive Trade Practices Act;

(xiv)    Whether Microsoft violated the California Unfair Competition Law (Cal. Bus. & Prof. Code §17200, *et seq.*);

(xv)    Whether Microsoft violated the California Law Regulating Automatic Renewal Charges (Cal. Bus. & Prof. Code §17600, *et seq.*);

(xvi)    Whether Microsoft violated the California Consumers Legal Remedy Act (Cal. Civ. Code §1750, *et. seq.*)

(xvii)    Whether Microsoft has received funds from Plaintiffs and class member that it unjustly received;

(xviii)  Whether Plaintiffs and proposed class members have been harmed and the proper measure of relief;

(xix)    Whether Defendant violated 18 U.S.C. §1030;

(xx)    Whether Plaintiffs and proposed class members are entitled to an award of punitive damages, attorney's fees and expenses against Defendant.

(e)    Plaintiffs' claims are typical of the claims of the members of the proposed class.

(f)      Plaintiffs will fairly and adequately protect the interests of the proposed class in that they have no interests antagonistic to those of the other proposed class members, and Plaintiffs have retained attorneys qualified in consumer class actions, business litigation, and complex litigation as counsel.

(g)      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(i)      Given the size of individual proposed class member's claims and the expense of litigating those claims, few, if any, proposed class members could afford to or would seek legal redress individually for the wrongs Defendant committed against them and absent proposed class members have no substantial interest in individually controlling the prosecution of individual actions;

(ii)      This action will promote an orderly and expeditious administration and adjudication of the proposed class claims, economies of time, effort, and resources will be fostered and uniformity of decisions will be insured; and

(iii)      Without a class action, proposed class members will continue to suffer damages, and Defendant's violations of law will proceed without remedy while Defendant continues to reap and retain the substantial proceeds of its wrongful conduct.

(iv)      Plaintiffs know of no difficulty that will be encountered in the management of this litigation, which would preclude its maintenance as a class action.

18

53.     Plaintiffs seek damages and equitable relief on behalf of the proposed class on grounds generally applicable to the entire proposed class.

# VII.

## ARBITRATION CLAUSE <u>DOES NOT</u> APPLY

54.     In November 2011, Defendant changed the Terms of Service and instituted an Arbitration Clause.  The Arbitration Clause was vague in that it did not specify the date it would go into effect.  The clause merely states, "<u>December 2011</u>".  Does this mean December 1, 2011, or December 31, 2011, or mid-December?

55.     The events giving rise to the instant case occurred before the Defendant's Arbitration Clause became effective and before the Arbitration Clause was published and ratified by the Defendant.  The Class Members were X-Box Live Subscribers that cancelled their accounts before December 2011, and are thus not limited by Defendant's Arbitration Clause.

56.     Consumers in New York, Connecticut, and Vermont are also not subject to Defendant's Arbitration Clause as an Arbitration Clause cannot be used to proscribe Federal Law.  *In re American Express Merchants Litig.,* 667 F.3d 204 (2d Cir. 2012).

57.     The Arbitration Clause is not retroactive, nor does it offer purchasers or subscribers any type of consideration to make the Arbitration Clause retroactive.

58.     For the aforementioned reasons, the Arbitration Clause does not bind the Plaintiff, the Class, or the Class members prior to December 2011, nor does it bind Class members from New York, Connecticut, and Vermont.  The Arbitration Clause does not prevent the Plaintiff, the Class, or the Class members from New York, Connecticut, and Vermont from bringing the instant suit.

## VIII.

## FIRST CAUSE OF ACTION

### (Fraud under Texas Common Law)

59.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

60.     To establish common law fraud in Texas, a plaintiff must prove that a) the defendant made a material misrepresentation, b) which was false, c) which was either known to be false when made or which was recklessly made as a positive assertion without knowledge of its truth, d) which the speaker made with the intent that it be acted upon, e) the other party took action in its reliance upon the representation, and f) thereby suffered injury. *In re FirstMerit Bank, N.A.,* 52 S.W. 3d 749, 758 (Tex. 2001); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998).

61.     Microsoft committed common law fraud in Texas by representing that: the subject gaming system was functional and suitable for sale, selling subject gaming system with defective components, knowing the gaming system was defective thus allowing unauthorized credit card charges, advertising that the gaming system was

suitable for use, that Plaintiffs relied upon Microsoft's statements of suitability, and that Plaintiffs suffered injury. *In re FirstMerit Bank, N.A.,* 52 S.W. 3d 749, 758 (Tex. 2001); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998).

62.     Microsoft also committed common law fraud in Texas by charging subscribers' credit card without customer authorization.  These subscribers were then billed for purchases they did not make.  These subscribers suffered injury in the form of monetary losses as they paid for these unauthorized purchases.

63.     Plaintiffs reserve the right to allege other violations of law which constitute other unlawful business acts and practices.  Such conduct is ongoing and continues to this date.

64.     Microsoft's conduct caused and continues to cause substantial injury to consumers and their property, including Plaintiffs and proposed class members.  The gravity of Defendant's alleged wrongful conduct outweighs any purported benefits attributable to such conduct.  There were also reasonable available alternatives to Microsoft to further its business interests, other than voluntarily placing its defective gaming system into the stream of commerce.

65.     Plaintiffs and Class members have suffered injury in fact and have lost money and/or property as a result of Defendant's unfair and unlawful business practices and are therefore entitled to the relief available under Texas Law.

**IX.**

21

## SECOND CAUSE OF ACTION

### (Violations of the Texas Deceptive Trade Practices Act)

66.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

67.     This cause of action arises under the Texas Deceptive Trade Practices Act, Texas Business and Commerce Code Section 17.46 (b)(5), (7), (9), and (24).  Plaintiffs are consumers as defined by Texas Business and Commerce Code Section 17.45 (4). Microsoft's X-Box LIVE gaming system constituted "goods" as defined by Tex Bus Comm Code 17.45 (1).  At all times relevant hereto, Microsoft constituted a "person" as that term is defined in Tex Bus Comm Code 17.45(3).

68.     Microsoft violated and continues to violate the DTPA by engaging in the following deceptive practices specifically proscribed by the Tex Bus Comm Code Section 17.46 (b), in transactions with Plaintiffs and class members that were intended to result or which resulted in the sale or lease of goods or services to consumers:

(a)     In violation of Tex Bus Comm Code Section 17.46 (b)(5), Defendant has represented that X-Box LIVE has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which it does not have;

(b)     In violation of Tex Bus Comm Code Section 17.46 (b)(7), Defendant has represented that the X-Box LIVE gaming system is of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(c)     In violation of Tex Bus Comm Code Section 17.46 (b)(9),

22

Defendant advertised the gaming system in question with the intent not to sell them as advertised;

(d)       In violation of Tex Bus Comm Code Section 17.46 (b)(24), Defendant has failed to disclose information concerning the gaming system, which was known at the time of the transaction, if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

69.      Microsoft has made uniform representations that its X-Box LIVE gaming system is a high-quality product that will perform as represented.  These representations, as set forth above, were false, deceptive, and/or misleading and in violation of the Texas Deceptive Trade Practices Act.

70.      Pursuant to the Texas Business and Commerce Code, Section 17.505(a), Plaintiffs have notified Microsoft in writing by certified mail of the particular violations of the Texas Deceptive Trade Practices Act alleged herein, and have demanded that Microsoft rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to act.  Plaintiffs sent this notice by certified mail, return receipt requested, to Microsoft's principal place of business.

71.      If Microsoft fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 60 days of the date of written notice, pursuant to the Texas Deceptive Trade Practices Act, Plaintiffs will amend their Complaint to seek actual, punitive, and statutory damages and all other relief available to Plaintiffs and the Class under the DTPA.

72.     In addition, pursuant to the Texas DTPA, Plaintiffs are entitled to, and therefore seek, a Court order enjoining the above-described wrongful acts and practices that violate the Texas DTPA.

73.     Plaintiffs and the class are also entitled to recover attorney's fees, costs, expenses, and disbursements pursuant to the Texas DTPA.

**X.**

**THIRD CAUSE OF ACTION**

**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

**(On Behalf of Plaintiffs and Class Members in California)**

74.  Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

75.  California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*., protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

76. The UCL prohibits any unlawful, unfair or fraudulent business act or practice. A business practice need only meet one of three criteria to be considered unfair competition. An unlawful business practice is anything that can properly be called a business practice and that at the same time is forbidden by law.

77.  Microsoft has violated the fraudulent prong of the UCL in that it failed to inform Plaintiffs and the Class that it would charge subscriber's credit cards without cardholders' consent.

78.  Microsoft has violated the fraudulent prong of the UCL in that it failed to inform Plaintiffs and the Class that it would access a secure database to obtain

subscribers' credit card information to include: card numbers, addresses, and expiration dates in order to submit illegal and unauthorized charges to cardholders' issuing banks.

79.  Microsoft has violated the unfair prong of the UCL in that it continues to profit from obtaining Plaintiffs' and the Class's credit card information and charging additional fees, even though subscribers have cancelled their subscriptions with Microsoft.

80.  Microsoft has violated the unlawful prong of the UCL in that its conduct violated the Fraud and Related Activity in Connection with Computers Act (18 U.S.C. §§ 1030, *et seq.*), the California Law Regulating Automatic Renewal Charges (Cal. Bus. & Prof. Code §§17600, *et seq.*), and the California Consumers Legal Remedies Act (Cal. Civ. Code §1750, *et. seq.*)

81.  Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs, on their own behalf and on behalf of the Class, seek an order enjoining Microsoft from continuing to engage in the unfair and unlawful conduct described herein, an award of attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5, as well as such other and further relief as the Court deems just and proper.


## XI.

## FOURTH CAUSE OF ACTION

**Violation of California's Law Regulating Automatic Renewal Charges
Cal. Bus. & Prof. Code §§ 17600, *et seq.***

**(On Behalf of Plaintiffs and Class Members in California)**

82. Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

83. California's Bus. & Prof. Code §§ 17600, *et seq*., protects consumers against automatic renewal charges when consumers purchase goods and services either online or offline.

84. This law requires companies to make greater disclosures to and obtain affirmative consent from consumers prior to charging them under automatic renewal plans, (such as plans in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term.

85. The intent of the law is to end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumer's explicit consent for ongoing shipments of a product or ongoing deliveries of service.

86. X-Box LIVE and Microsoft violated and continue to violate §§17600-17606 of the California Automatic Renewal Charges Law by not clearly and conspicuously disclosing the terms of the automatic renewal offer in visual proximity to the request for consent to the offer.  Such terms not disclosed by X-Box LIVE include the information that the subscription will continue until the consumer cancels, a description of the cancellation policy, information about recurring charges, the length of the renewal term, and the minimum purchase obligation.  "Clearly and conspicuously" means that the terms must be presented either in larger type than the surrounding text or in contrasting type, font, or color from the surrounding text of the same size, or set off from the surrounding text in a manner that clearly calls attention to the items.

87. X-Box LIVE and Microsoft violated and continue to violate §§17600-17606 of the California Automatic Renewal Charges Law by not obtaining a consumer's

affirmative consent to the terms of the automatic renewal offer before the consumer is charged.

88. X-Box LIVE and Microsoft violated and continue to violate §§17600-17606 of the California Automatic Renewal Charges Law by not providing a cost-effective, timely and easy to use method for cancelling the automatic renewal service, including a toll-free telephone number, email address, or a postal address (only if the company directly bills the consumer).

89. X-Box LIVE and Microsoft violated and continue to violate §§17600-17606 of the California Automatic Renewal Charges Law because X-Box LIVE either before or after completion of the initial order, did not:

   (a)   Provide a confirmation to the consumer that includes the terms of the automatic renewal offer;

   (b)   A description of the cancellation policy;

   (c)   Information on how to cancel; and

   (d)   If the offer includes a free trial (which X-Box LIVE does), the fact that the consumer may cancel before being charged, in a manner that is capable of being retained by the consumer.

90.  If X-Box LIVE sends goods or products to a consumer under an automatic renewal agreement without first obtaining the consumer's affirmative consent, the goods are deemed an unconditional gift and the consumers are entitled to a refund of their money.

91.  Violations of this statute subject the company to all available civil remedies and a civil penalty of $2,500.00 for each violation.

92.  Pursuant to Cal. Bus. & Prof. Code §§ 17600, et seq., Plaintiffs, on their own behalf and on behalf of the Class, seek an order enjoining Microsoft from continuing to engage in the unlawful conduct described herein, an award of attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5, as well as such other and further relief as the Court deems just and proper.

## XII.

### FIFTH CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act
Cal. Civil Code §§ 1750, *et seq*.**

**(On Behalf of Plaintiffs and Class Members in California)**

93.  Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

94.  This cause of action arises under the California Consumers Legal Remedy Act, California Civil Code §1770 (a)(5), (7), (9), and (14).  Plaintiffs are consumers as defined by California Civil Code §1761(d).  Microsoft's X-Box LIVE gaming system constituted "goods" as defined by California Civil Code §1761(a).  At all times relevant hereto, Microsoft constituted a "person" as that term is defined in California Civil Code §1761(c).

95.  Microsoft violated and continues to violate the CCLRA by engaging in the following deceptive practices specifically proscribed by the California Civil Code Section

1770(a), in transactions with Plaintiffs and class members that were intended to result or which resulted in the sale or lease of goods or services to consumers:

(a)      In violation of Cal. Civ. Code §1770(a)(5), Defendant represented that X-Box LIVE has sponsorship, approval, characteristics, uses, or benefits which it does not have;

(b)      In violation of Cal. Civ. Code §1770(a)(7), Defendant represented that the X-Box LIVE gaming system is of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(c)      In violation of Cal. Civ. Code §1770(a)(9), Defendant advertised the gaming system in question with the intent not to sell them as advertised;

(d)      In violation of Cal. Civ. Code §1770(a)(14), Defendant represented that the transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

96.     Microsoft has made uniform representations that its X-Box LIVE gaming system is a high-quality product that will perform as represented.  These representations, as set forth above, were false, deceptive, and/or misleading and in violation of the California Consumers Legal Remedy Act.

97.     Microsoft has made uniform representations that its X-Box LIVE gaming system is a suitable for all ages and safe for families with kids.  Microsoft also assured consumers that their credit card information was stored on secure servers.  Microsoft also assured consumers that they could cancel their X-Box LIVE memberships at any time,

and not be billed again.  Microsoft also assured consumers that they would only pay for purchases consumers made on their X-Box LIVE accounts.  These representations, as set forth above, were false, deceptive, and/or misleading and in violation of the California Consumers Legal Remedies Act.

98.     Microsoft advertised its X-Box LIVE gaming system as "suitable for all ages", the "entertainment center of the living room", and "safe for children" whereas Microsoft knew of the defect regarding X-Box LIVE billing and unauthorized charges placed on consumers' credit cards.

99.     Microsoft represented that X-Box LIVE billing system was safe, secure, and functional even though the billing system fraudulently charged consumer's credit cards and X-Box LIVE did not comply with California's Automatic Renewal Charges Law, California Business and Professions Code §§17600, et seq.

100.     Violations of this statute subject the company to all available civil remedies and a civil penalty of $1,000.00 for each violation.

101.  Pursuant to Cal. Civ. Code §1780, Plaintiffs, on their own behalf and on behalf of the Class, seek an order enjoining Microsoft from continuing to engage in the unlawful conduct described herein, an award of attorneys' fees and costs pursuant to Cal. Code Civ. Proc. §1021.5, as well as such other and further relief as the Court deems just and proper.

102.     Pursuant to the California Civil Code, §1782, Plaintiffs have notified Microsoft in writing by certified mail of the particular violations of the California Consumers Legal Remedy Act alleged herein, and have demanded that Microsoft rectify

the problems associated with the actions detailed above and give notice to all affected

consumers of its intent to act.  Plaintiffs sent this notice by certified mail, return receipt

requested, to Microsoft's principal place of business.

103.    If Microsoft fails to rectify or agree to rectify the problems associated with

the actions detailed above and give notice to all affected consumers within 30 days of the

date of written notice, pursuant to the California Consumers Legal Remedy Act, Plaintiffs

will amend their Complaint to seek actual, punitive, and statutory damages and all other

relief available to Plaintiffs and the Class under the CCLRA.

104.    In addition, pursuant to the California Consumers Legal Remedy Act,

Plaintiffs are entitled to, and therefore seek, a Court order enjoining the above-described

wrongful acts and practices that violate the CCLRA.

105.    Plaintiffs and the class are also entitled to recover attorney's fees, costs,

expenses, and disbursements pursuant to the CCLRA.


## XIII.

## SIXTH CAUSE OF ACTION

## (Violations of the Magnuson-Moss Warranty Act, 15 U.S.C. Sec 2310(d)(1))

106.    Plaintiffs re-allege and incorporate by reference the allegations contained

in the paragraphs above as if fully set forth herein.

107.    By placing its X-Box LIVE gaming system in the stream of commerce,

Microsoft impliedly warranted that it was reasonably safe for its intended use, i.e., to

serve as a suitable gaming system, and to function without unauthorized charges to consumers' credit cards.

108.    Microsoft's X-Box LIVE gaming system is not merchantable.  In breach of the implied warranty of merchantability and fitness for a particular purpose, Microsoft's gaming system fails to work properly, thus unlawfully charging users' accounts for unauthorized credit card transactions.

109.    Microsoft's gaming system was not reasonably designed for its intended use when it left Defendant's control and entered the market.

110.    The gaming system's defects were not open and/or obvious to consumers. Any purported limitation of the duration and scope of these warranties given by Microsoft is unreasonable, unconscionable, and void, because Microsoft knew or recklessly disregarded the fact that the defect in the gaming system existed and might not be discovered, if at all, until the gaming system had been used and unauthorized credit card charges accrued where the funds would not be returned by the Defendant.  Microsoft willfully withheld information about the defect from purchasers and subscribers of Microsoft's X-Box LIVE gaming system.  Moreover, due to the unequal bargaining power between the parties, Plaintiffs and the class members had no meaningful alternative to accepting Defendant's refusal to return unauthorized credit card charges.

111.    The defective design and manufacture of the X-Box LIVE gaming system was, and is, an inherent defect which either was known or which should have been known to Microsoft to be a defect at the time Plaintiffs and class members purchased their X-Box LIVE subscription.  Indeed, the gaming system was intentionally designed

by Microsoft's founder Bill Gates to serve as a platform to sell premium services for a fee.

112.    The presence of this defect, and Microsoft's failure to warn of its presence or cure the defect, constitutes a breach of both the express and implied warranties.

113.    Microsoft's knowledge of this inherent defect, through both Plaintiff's 60-day demand letter, and through complaints lodged to its own customer service representatives, has given Microsoft more than a reasonable opportunity to cure the defect – an opportunity that Microsoft has failed and refused to take.

114.    As a result, Plaintiffs and proposed class members have been damaged in, inter alia, the amount they paid to purchase and subscribe to Microsoft's un-merchantable X-Box LIVE gaming system, the unauthorized amounts charged to their credit cards, and if no replacement for X-Box LIVE exists, in the total amount they paid for their continuing subscription to X-Box LIVE, which contains the defective software as an organic component.

115.    Pursuant to 15 U.S.C. Sec 2310(D)(2), Plaintiffs are also entitled to attorney's fees and reimbursement of expenses.


**XIV.**

**SEVENTH CAUSE OF ACTION**

**(Breach of Implied Warranty of Fitness for a Particular Purpose)**

116.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

117.     By placing its X-Box LIVE gaming system in the stream of commerce, Microsoft impliedly warranted that its gaming system was reasonably fit for its particular purpose, i.e., to withstand usual use as a gaming device without unauthorized credit card charges to consumers' accounts.

118.     Microsoft's gaming system is not fit for its particular purpose.  In breach of the implied warranty of fitness for a particular purpose, Microsoft's gaming system is defective, and allows unauthorized credit card transactions.  Moreover, these transactions are illegal as 1) the cardholder did not authorize the charges, 2) cardholders derived no benefits from the these charged; and/or 3) X-Box LIVE accessed a secure database with the cardholders' information to process these charges.

This failure, by allowing unauthorized credit card charges, limits the functionality of the subject gaming system.  When a refund is requested by the consumer credit card holder, Defendant refuses to give a refund.

119.     Microsoft's gaming system was not reasonably suited for its intended particular use when it left Defendant's control and entered the market.

120.     The gaming system defects were not open and/or obvious to consumers.

121.     Any purported limitation of the duration and scope of the implied warranty of fitness for a particular purpose given by Microsoft is unreasonable, unconscionable, and void, because Microsoft knew or recklessly disregarded that the defect in the gaming system existed and might not be discovered, if at all, until the gaming system had been used for a period of time longer than the period of any written warranty, and/or after the credit card had been illegally charged, and Microsoft willfully

withheld information about the defect from purchasers and/or subscribers to the X-Box LIVE gaming system.  Moreover, due to the unequal bargaining power between the parties, Plaintiffs and class members had no meaningful alternative to accepting Microsoft's attempted pro forma limitation of the duration of any warranties and Microsoft's refusal to issue refunds.

122.    Furthermore, Microsoft did have knowledge of the defect, and rather than attempt to repair the defect, Microsoft hid the defect in future updates to the X-Box LIVE gaming system and attempts to institute an Arbitration Clause covering the defective gaming system.  This constructive knowledge and attempt to hide the defect, demonstrates Microsoft disregarded its duty to notify consumers of the defect.

In addition, if the defective gaming system and unauthorized credit card charges were brought to the attention of the Defendant, consumers were told that it was just "too bad" and "that's the policy" as consumers were denied refunds.

123.    As a result, Plaintiffs and proposed class members have been damaged in, inter alia, the amount they paid to purchase and subscribe to Microsoft's unfit gaming system, the unauthorized credit card charges, and if no suitable replacement exists, in the total amount they paid for their continuing subscription to X-Box LIVE, which contains the defective software as an organic component.

## XV.

## EIGHTH CAUSE OF ACTION

## (Breach of Implied Warranty of Merchantability)

124.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

125.     By placing its gaming system in the stream of commerce, Microsoft impliedly warranted that its gaming system was reasonably functional for its intended use, i.e., to withstand usual use as a gaming system and to operate without allowing unauthorized credit card charges.

126.     Microsoft's gaming system is not merchantable.  In breach of the implied warranty of merchantability, Microsoft's gaming system fails to operate properly, allows unauthorized credit card charges, allows illegal credit card charges, and reduces the functionality of the subject gaming system.

127.     Microsoft's gaming system was not reasonably designed and/or manufactured for its intended use when it left Defendant's control and entered the market.

128.     The gaming system defects were not open and/or obvious to consumers.

129.     Any purported limitation of the duration and scope of the implied warranty of merchantability given by Microsoft is unreasonable, unconscionable and void, because Microsoft knew or recklessly disregarded that the defect in the gaming system existed and might not be discovered, if at all, until the gaming system had been used for a period of time longer than any written warranty, and unauthorized credit card charges applied to the Plaintiffs' accounts.  Microsoft willfully withheld information about the defect from purchasers of Microsoft's gaming system.  Moreover, due to the unequal bargaining power between the parties, plaintiffs and the class members had no

meaningful alternative to accepting Microsoft's attempted pro forma limitation of the duration of any warranties and Microsoft's refusal to issue a refund.

130.    As a result, Plaintiffs and proposed class members have been damaged in, inter alia, the amount they paid to purchase and/or subscribe to Microsoft's unmerchantable gaming system, the amount of unauthorized credit card charges, and if no suitable replacement exists, in the amount they paid for their subscription to the X-Box LIVE gaming service which relies on the defective software usage.

## XVI.

## NINTH CAUSE OF ACTION

### (Negligence)

131.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

132.    The conduct of Microsoft in manufacturing, distributing, and selling the X-Box LIVE gaming system constituted negligence in failing to reasonably act in accordance with all applicable standards of care.  Microsoft owed Plaintiffs and class members a duty not to disseminate a materially defective product.

133.    Microsoft also breached its duty of care by negligently failing to timely and/or adequately warn Plaintiff and the class of the defective condition of the gaming system, even after Microsoft was, or should have been, fully aware of the material defects in said gaming system.

134.     As a direct and proximate result of Microsoft's negligence, Plaintiffs and members of the class suffered economic injury, entitling them to just compensation, as detailed below.

## XVII.

## TENTH CAUSE OF ACTION

### (Money Had and Received)

135.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

136.     As more fully set forth above, Microsoft had in its possession money which in equity and good conscience belongs to Plaintiff and Class members, which should be refunded to Plaintiffs and Class members.

## XVIII.

## ELEVENTH CAUSE OF ACTION

### (Unjust Enrichment)

137.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

138.     Microsoft improperly received and continues to improperly receive from Plaintiffs and Class members millions of dollars as result of the conduct alleged above.

139.     As a result, Plaintiffs and the class have conferred a benefit on Microsoft to which Microsoft is not entitled.  Microsoft has knowledge of this benefit, wrongfully and deceptively obtained this benefit, and has voluntarily accepted and retained the

benefit conferred to it.  Microsoft will be unjustly enriched if it is allowed to retain such funds and therefore, a constructive trust should be imposed on all monies wrongfully obtained by Microsoft and the money should be disgorged from Defendant, and returned to Plaintiffs and the class.

## XIX.

## TWELTH CAUSE OF ACTION

## (Violation of 18 U.S.C. § 1030 (a)(2)(A), (a)(2)(C), (a)(4), (g)

## Fraud and related activity in connection with Access Devices)

140.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

141.    Microsoft improperly received and continues to improperly receive from Plaintiffs and Class members millions of dollars as result of the conduct alleged above.

142.    Plaintiffs allege Defendant Microsoft knowingly and with the intent to defraud designed an online gaming system (known as X-Box LIVE) that would charge Plaintiffs' credit cards without Plaintiffs' authorization.

143.    The term "protected computer" in this portion of the United States Code refers to any computer, "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. §1030 (e)(2)(B).

144.    Such activity is a violation of 18 U.S.C. § 1030(a)(2)(A) insofar that Defendant Microsoft knowingly accessed a computer without authorization or exceeding authorized access, obtained and used the information contained in a financial record (credit cards and account numbers) through its X-Box LIVE gaming system to obtain funds in aggregate value of $5,000.00 or more during the period.

145.    Such activity is a violation of 18 U.S.C. § 1030(a)(2)(C) insofar that Defendant Microsoft knowingly accessed a computer without authorization or exceeding authorized access, obtained information (credit card data to include credit card number, address, expiration date, and cardholder's name) from a protected computer to fraudulently receive payment during any 1-year period where the aggregate value of such payments received is greater than $1,000.00.

146.    Such activity is a violation of 18 U.S.C. § 1030(a)(4) insofar that Defendant Microsoft knowingly and with intent to defraud, accessed a computer without authorization or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, such that the object of the fraud is more than $5,000 in any 1-year period.

147.    Such activity is subject to civil remedies. In accordance with 18 U.S.C. §1030(g), any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.

148.    Microsoft improperly received and continues to improperly receive from Plaintiffs and Class members millions of dollars as result of the conduct alleged above.

149.    Plaintiffs and Class Members bring a 18 U.S.C. §1030 claim for compensatory damages and injunctive relief against Microsoft due to Defendant's actions.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray this Court enter a judgment against Defendant that:

A.    This action be certified and maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certify the proposed class as defined;

B.    Awards compensatory and/or punitive damages as to all Causes of Action where such relief is permitted;

C.    Awards Plaintiffs and proposed class members the costs of this action, including reasonable attorney's fees and expenses;

D.    Orders Microsoft to immediately cease its wrongful conduct as set forth above; enjoins Microsoft from continuing to falsely market and advertise, conceal material information, and conduct business via the unlawful and unfair business acts and practices complained of herein, orders Microsoft to engage in a corrective notice campaign, and required Microsoft to refund to Plaintiffs and all of the class members the funds paid to Microsoft for these defective products, including, if no reasonably safe replacement product exists, the full price paid for the subject purchase and/or subscription;

E.    Awards equitable monetary relief, including restitution and disgorgement of

all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise

restricting the proceeds of Defendant's ill-gotten gains, to ensure that Plaintiffs and

proposed class members have an effective remedy;

F.      Awards pre-judgment and post-judgment interest at the legal rate; and

G.      Such further legal and equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: May 15, 2013                    Respectfully submitted,

                          By:    /s/ Omar W. Rosales
                                 Omar W. Rosales
                                 Federal No. 69067; Atty. In Charge

                                 **THE ROSALES LAW FIRM, LLC**
                                 WWW.OWROSALES.COM
                                 OMAR W. ROSALES
                                 Federal No. 69067
                                 402 SOUTH F ST
                                 HARLINGEN, TX 78550
                                 (866) 402-8082 Toll-Free
                                 (956) 423-1417 Tel
                                 (956) 444-0217 Fax

                                 The Herrera Law Firm
                                 SONIA HERRERA
                                 Texas Bar No. 24046067
                                 502 E Harrison Ave, Suite B
                                 Harlingen, TX 78550
                                 (956) 742-9838 Tel

CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Local Rules, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

/s/ Omar W. Rosales

OMAR W. ROSALES,
ATTORNEY OF RECORD
FOR PLAINTIFFS DENNIS WALSH, DEZRA
GUTHRIE, FRANK ORTEGA, LESLIE
SWEENEY-FAGAN, JOHN SWEENEY, AND
KATHERINE ORTIZ

CERTIFICATE OF SERVICE

I, Omar W. Rosales, do hereby, certify that on MAY 15, 2013 a true and correct copy of the above and foregoing First Amended Complaint was sent via EFILE/DCECF to DEFENDANT MICROSOFT'S Attorneys of Record.

/s/ Omar W. Rosales

OMAR W. ROSALES